UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

DEBRA BROWN, JEROME BELL,                    )
CHARLES BROOKS, JASON                        )
SWEARINGTON, and NICOLE GULLETT,             )
                                             )
    *Plaintiffs,*                            )
                                             )        Case No: 4:08-cv-93
v.                                           )
                                             )        Judge Mattice
COFFEE COUNTY, TENNESSEE,                     )
STEVE GRAVES, individually and in his        )
official capacity, PAMELA FREEMAN,           )
SERGEANT RICK GENTRY, KEITH                  )
SHULLER, LIEUTENANT CHARLES                  )
BEATTY, KAYRON BOWEN,                        )
JONATHON YOTT, WAYNE FERRELL,                )
and TERESA HULAN,                            )
                                             )
    *Defendants.*                            )
                                             )

## MEMORANDUM AND ORDER

Plaintiffs Debra Brown, Jerome Bell, Charles Brooks, Jason Swearington, and

Nicole Gullett bring this action against Defendants Coffee County, Tennessee, Steve

Graves, Pamela Freeman, Sergeant Rick Gentry, Keith Shuller, Lieutenant Charles Beatty,

Kayron Bowen, Jonathan Yott, Wayne Ferrell, and Teresa Hulan, alleging that Defendant

Coffee County failed to maintain the Coffee County Jail in compliance with state and

federal standards and that the individual Defendants, employees of the jail, violated the

inmate Plaintiffs' rights under the Eighth and Fourteenth Amendments in various ways

relating to the treatment, or lack thereof, of Plaintiffs' medical conditions.

Plaintiffs also assert supervisory and municipal liability claims against Defendants

Sheriff Steve Graves, Lieutenant Pamela Freeman, and Coffee County, Tennessee.

Plaintiff Debra Brown asserts a separate Eighth Amendment claim, alleging that Defendants failed to protect her from serious harm while at the Jail.

Defendants have filed a Motion for Summary Judgment [Court Doc. 27]. For the reasons set forth below, Defendants' Motion for Summary Judgment will be **GRANTED**.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may bear this burden by either producing evidence that demonstrates the absence of a genuine issue of material fact, or by simply " 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. To refute such a showing, the nonmoving party may not simply rest on its pleadings. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see Anderson*, 477 U.S. at 249.

The nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Celotex*, 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Anderson*, 477 U.S. at 254. Thus, if the plaintiff must ultimately prove his case at trial by a preponderance of the evidence, the Court must, on motion for summary judgment, determine whether a jury could reasonably find by a preponderance of the evidence that the plaintiff's factual contentions are true. *See id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.   FACTS

The facts, viewed in the light most favorable to the Plaintiffs, are as follows.

Plaintiffs were inmates at the Coffee County Jail at the time of the incidents that gave rise to this action. (Court Doc. 1-1, Compl. ¶ 7.) Defendant Coffee County,

-3-

Tennessee, maintains the Coffee County Jail. (*Id.* ¶ 2.) Defendant Steve Graves is the Sheriff of Coffee County and allegedly has supervisory authority regarding the implementation and execution of policies at the Coffee County Jail. (*Id.* ¶ 4.) Defendants Pamela Freeman, Sergeant Rick Gentry, Keith Shuller, Lieutenant Charles Beatty, and Teresa Hulan are or were employees of Coffee County and work or worked as corrections officers at the Jail. (*Id.* ¶ 5.) Defendants Jonathan Yott, Kayron Bowen, and Wayne Ferrell comprised the nursing staff at Coffee County Jail during the time of these complained of acts. (*Id.* ¶ 6.) Plaintiffs assert that each of them suffered from a medical ailment that was improperly treated in violation of their constitutional rights. Because there are extensive facts relating to each individual Plaintiff's injury, each Plaintiff, and the relevant facts applicable to each, will be addressed separately.

### A. Plaintiff Debra Brown

Plaintiff Debra Brown alleges in the Complaint that she was attacked by another inmate on October 21, 2004. (*Id.* ¶ 11.) The inmate was allegedly mentally ill and known to be violent, but was not isolated away from other inmates. (*Id.* ¶ 12.) After the attack, during which Plaintiff Brown was allegedly slammed on the concrete floor twice, she laid there for four hours without help from any jail employees. (*Id.* ¶¶ 13-14.) When the next shift's employees arrived, an ambulance was finally called and Plaintiff Brown was taken to the emergency room, diagnosed with a compression fracture of the vertebra, and hospitalized. (*Id.* ¶¶ 15-16.)

During her deposition, Plaintiff Brown testified that the inmate who attacked her was Virginia Grimes, who told Plaintiff Brown and other inmates that she was mentally ill and

-4-

taking various medications.  (Court Docs. 29-4 & 34-2, Brown Dep. at 82-84.)  Plaintiff Brown asserted that she was reading a book at about four in the morning when Ms. Grimes came over and tried to shove her, apparently because they were arguing about cigarettes. (*Id.* at 90-92.)  Plaintiff Brown does not remember what happened after that, and relied solely on what she was told by others who saw the incident.  (*Id.* at 95-96.)  Jail nurse Jonathan Yott, jailer Ashley Stacey, and some of Plaintiff's cell mates later told her that she was slammed twice on the floor.  (*Id.* at 96-97.)  Plaintiff Brown's cell mates helped her to her bunk, where she laid "screaming and crying" while they attempted to get help.  (*Id.* at 98.)    Plaintiff Brown first stated that she laid on the bunk for "at least three or four hours" before anyone came to help her, but later stated that Defendant Gentry came back twenty to thirty minutes after she was attacked.  (*Id.* at 99-100.)  Plaintiff Brown stated that she told Defendant Gentry "that I had fell on the floor and that I needed to go to the hospital bad" and lied because there were "probably forty people there that would kill me if I told him it was over cigarettes." (*Id.* at 101-102.) Defendant Gentry brought Plaintiff Brown two Tylenol and a bag of ice.  (*Id.* at 100.)  Plaintiff Brown stated that she was told that she could not be taken to the emergency room until the nurse arrived with the day shift employees.  (*Id.* at 103.)  Plaintiff Brown testified that when the day shift employees arrived, one jailer came back and called for a few people, including Plaintiff Brown, to go see the nurse.  (*Id.*)  Later, Defendant Freeman came back and yelled at Plaintiff Brown to get up and go to the nurse.  (*Id.*)  Plaintiff Brown could not move, however, and eventually a stretcher was brought to her and she was transported to the hospital.  (*Id.* at 104.)

Defendant Gentry testified during his deposition that Plaintiff Brown told him "she had slipped and fell coming from the toilet and she had hurt her back." (Court Docs. 29-7 & 35-1, Gentry Dep. at 18.) Defendant Gentry stated that she did not look to be in extreme pain at the time and Plaintiff Brown told him that the pain "was bad, but not that bad." (*Id.* at 19.) Defendant Gentry testified that "[f]rom what [Plaintiff Brown] had told me, from the way she was acting, didn't appear in any major pain, that she needed to be taken to the hospital at the time." (*Id.* at 40.) Defendant Gentry offered her Tylenol or ibuprofen and a bag of ice and said the nurse could see her in the morning. (*Id.* at 19-20.) Approximately 15 minutes later, Defendant Gentry received a call from another corrections officer, who stated that Plaintiff Brown wanted to go to the hospital. (*Id.* at 20-21.) Defendant Gentry testified that he called one jail nurse, Defendant Ferrell, and was advised to give Plaintiff Brown Tylenol or ibuprofen and an ice pack, and Defendant Yott would see her in the morning. (*Id.* at 21.)

Defendant Yott testified in deposition that he went back to see Plaintiff Brown upon arriving at the jail that morning around 8:00 a.m., and Plaintiff Brown told him she had slipped and fell. (Court Doc. 29-12, Yott Dep. at 47-48.) Upon reports from Plaintiff Brown that she was unable to move her legs, Defendant Yott called for an ambulance and Plaintiff Brown was admitted to the emergency room at 9:05 a.m. (Yott Dep. at 48, Florence Dep. at 32.)

**B.    Plaintiff Jerome Bell**

Plaintiff Jerome Bell alleges in the Complaint that he cut his finger on a showerhead in the Coffee County Jail on or about October 1, 2004. (Compl. ¶ 22.) Plaintiff asserts that

his requests for medical treatment were denied for a week, and he was finally taken to the hospital on or about October 8, 2004. (*Id.* ¶ 23.) After he returned to the Jail, he allegedly continued to request medical treatment, which was denied. (*Id.* ¶¶ 24-25.) It was only when Plaintiff Bell's mother visited and saw his swollen finger that he was given medical treatment. (*Id.* ¶ 26.) While hospitalized, Plaintiff Bell's finger turned black and was eventually amputated at Vanderbilt University Medical Center. (*Id.* ¶¶ 27-28.)

In his deposition, Plaintiff Bell testified that about two or three hours after he cut his finger on October 1, 2004, it began to hurt and he requested medical attention. (Court Doc. 29-1, Bell Dep. at 34.) A member of the jail staff, Brittany Hodges, gave him a band-aid and some antibiotic ointment and told him there was nothing else that she could do. (*Id.* at 32.) Plaintiff Bell testified that when he initially saw Ms. Hodges, he did not think he needed more serious medical attention, stating that "I just hit it, you know what I mean? I didn't think it would be that serious, you know what I mean." (*Id.* at 36.) The next day, Plaintiff Bell's finger was swollen and painful, so he filled out a Medical Request form and saw Defendant Yott. (*Id.* at 37-40.) Although Plaintiff Bell did not specifically remember this, there are medical records indicating that he was admitted to the emergency room of the hospital later that morning and was prescribed various medications. (*Id.* at 42.) Plaintiff Bell does not remember going to the hospital again on October 6, 2004, but there are records indicating that he was admitted again at the request of his mother after she was at the jail for a scheduled visitation. (*Id.* at 46-47.) Dr. Florence testified that Plaintiff Bell refused to go back to the hospital between his first visit on October 2, 2004, and his second visit on October 6, 2004. (Florence Dep. at 63.)

### C. Plaintiff Charles Brooks

Plaintiff Charles Brooks alleges in the Complaint that he fell in the shower at the jail and hit his elbow and knee on the floor on or about May 15, 2005. (Compl. ¶ 30.) Plaintiff Brooks asserts that he went to the hospital for x-rays but was then returned to the jail, where his elbow became painful, swollen, and limited in movement. (*Id.* ¶¶ 31-32.) Plaintiff Brooks alleges that he requested medical treatment many times, but his requests were ignored until he was finally taken to see Dr. Florence, the jail doctor, on July 1, 2005. (*Id.* ¶ 33.) Plaintiff Brooks asked Dr. Florence for a CT scan of his elbow but was advised that he would have to pay for such a test and any corresponding medication. (*Id.* ¶ 34.)

During his deposition, Plaintiff Brooks testified that after he initially received x-rays at the hospital, he requested medical treatment several times and was only given a sling and a removable cast for his arm, which were later taken away. (Court Docs. 29-3 & 34-1, Brooks Dep. at 44-45.) Plaintiff Brooks testified that, while at the hospital, the emergency room doctor said that he needed a CT scan of his elbow and was attempting to arrange that with Dr. Florence. (*Id.* at 43-44.) After returning to jail, Plaintiff Brooks stated that he requested treatment for several weeks and was never taken to see the nurse. (*Id.* at 45-46.) When he finally did see the nurse, Defendant Bowen, she said there was nothing wrong with his elbow. (*Id.* at 46.) Plaintiff Brooks continued to fill out requests for medical attention and stated that Defendant Bowen wrote back that he should stop filling out requests because there was nothing wrong with him. (*Id.* at 49.) Eventually he saw Dr. Florence, who said that Plaintiff Brooks could only get an CT scan if he paid for it himself and prescribed Naprosyn for the swelling. (*Id.* at 49-50.) Plaintiff Brooks testified that the

pain became so bad that he went on medical furlough to seek treatment. (*Id.* at 51.)

Defendant Bowen testified during deposition that she had several conversations with Plaintiff Brooks about the CT scan and repeatedly told him that she could not send him to the hospital to get a CT scan without an order from Dr. Florence. (Court Doc. 29-2, Bowen Dep. at 32.) Dr. Florence testified that the elbow x-rays that Plaintiff Brooks received in the hospital were normal and there was no need for a CT scan. (Florence Dep. at 68-69.) Dr. Florence prescribed Naprosyn for what he diagnosed as arthritis. (*Id.* at 71-72.) Dr. Florence denied that the emergency room doctor tried to arrange for a CT scan for Plaintiff Brooks, and explained that because a CT scan was not medically necessary, the County would not pay for it and Plaintiff Brooks would have to provide payment. (*Id.* at 73-74.) Dr. Florence stated that medically necessary medications were provided to inmates and they did not have to pay. (*Id.* at 74-75.)

### D. Plaintiff Jason Swearington

Plaintiff Jason Swearington alleges in the Complaint that he cut his left leg badly while working with a jail program on or about August 31, 2004. (Compl. ¶ 36.) Plaintiff Swearington was allegedly only given Neosporin and a band-aid for the cut, which then developed an infection. (*Id.* ¶¶ 37-38.) Plaintiff Swearington asserts that he asked for medical treatment but was not taken to the nurse for a few days. (*Id.* ¶ 39.) Plaintiff Swearington alleges that he continued to request treatment, but did not receive proper treatment until his mother took him to the hospital weeks later. (*Id.* ¶ 40.) At this time, Plaintiff Swearington's leg was swollen and he had a high temperature, resulting in a hospital stay of six days. (*Id.* ¶¶ 41-42.)

-9-

During his deposition, Plaintiff Swearington testified that after he cut his leg, he was sent to the office and given a band-aid and antibiotic ointment, then went back to work. (Court Docs. 29-10 & 33-3, Swearington Dep. at 21-23.) After he arrived back at the jail, Plaintiff Swearington went to see the nurse and Defendant Yott gave him gauze pads and more ointment. (*Id.* at 24-25.) Plaintiff Swearington testified that he took care of the wound, but a couple of weeks later it was red and swollen. (*Id.* at 28.) Plaintiff Swearington asked to see the nurse, and Defendant Yott gave him sterile water with which to wash it, some ointment, and said his other symptoms (fever, vomiting, chills) were due to the flu. (*Id.* at 28-30.) Plaintiff Swearington stated that his symptoms got worse, but he continued to work and did not fill out a request for medical attention. (*Id.* at 30-32.) One day during work, Plaintiff Swearington became very ill and was taken back to the jail, where he contacted his mother and was taken to the hospital. (*Id.* at 33-36.) Plaintiff Swearington was given antibiotics and released from the hospital that day, but returned to the hospital later when he continued to have symptoms and his *right* leg was swollen and turning black. (*Id.* at 39-40.) Plaintiff Swearington was treated by Dr. Florence and remained in the hospital for several days. (*Id.* at 38-39, 42-43.) Plaintiff Swearington stated that he never experienced any problems receiving the prescribed medications. (*Id.* at 43-45.) Plaintiff Swearington stated, however, that Dr. Florence gave him an oral antibiotic instead of an injection of a different antibiotic. (*Id.* at 54-56.) Plaintiff Swearington also asserted that he believed he should have gotten stitches in his cut immediately and should not have gone back to work, although he acknowledged that work was voluntary. (*Id.* at 45-47.)

-10-

Dr. Florence testified that when he saw Plaintiff Swearington after his first hospital visit, Plaintiff Swearington's wound looked fine. (Florence Dep. at 49-52, 54.) When Plaintiff Swearington was taken back to the hospital several days later, his symptoms were very severe, and Dr. Florence testified that he may have developed a new infection or a new wound. (*Id.* at 53-54.)

### E. Plaintiff Nicole Gullett[1]

Plaintiff Nicole Gullett alleges in the Complaint that she experienced abdominal pains on or about August 8, 2005 and requested medical treatment, but was not taken to the nurse for several days. ( Compl. ¶ 47.) When Plaintiff Gullett did receive treatment over the next few days, she was prescribed Tylenol and juice by the jail nurse, then juice, ibuprofen, and a liquid diet by both the jail nurse and the jail doctor. (*Id.* ¶¶ 48-50.) Plaintiff alleges that Defendant Shuller refused to give her the medication and juice she required. (*Id.* ¶ 51.) Plaintiff Gullett's condition worsened over the next few days, and she began vomiting, turning yellow, running a fever, and bleeding rectally and vaginally. (*Id.* ¶¶ 52-53.) Plaintiff Gullett asserts that she asked to be taken to the hospital but was not taken immediately. (*Id.* ¶ 53.) After Plaintiff Gullett passed out the following day, she was taken to the hospital and diagnosed with a urinary tract infection. (*Id.* ¶ 54.) Plaintiff Gullett remained in the hospital for three days. (*Id.*) Plaintiff was then charged approximately $40 for the over-the-counter medications prescribed for her. (*Id.* ¶ 55.)

Plaintiff Gullett testified at deposition that she had recurring problems receiving her

---

[1] The Complaint lists this Plaintiff as Nicole Gullett, but she also appears as Nicole Fizer or Nicole Tubaugh in various documents filed in this action. For the sake of consistency, the Court will refer to her as Nicole Gullett throughout, as that name appears in the Complaint.

medications. Plaintiff Gullett also asserted that she tried to seek medical attention for several days before she was able to see Defendant Bowen. (Court Doc. 29-11, Gullett Dep. at 52.) Instead of filling out requests for medical attention, she wrote letters, placed them in envelopes, wrote "Nurse" on the front, and gave them to one of the corrections officers. (*Id.*) According to jail records, Plaintiff Gullett was seen by Defendant Bowen for a preliminary physical examination on July 30, 2005, shortly after she was admitted to the Jail. (Court Doc. 29-11 pp. 13-14.) At the time of this examination, Plaintiff Gullett was not experiencing symptoms of a urinary tract infection. (Gullett Dep. at 53-54.) Plaintiff Gullett testified that her symptoms began between July 30, 2005 and August 7, 2005. (*Id.* at 54.) Plaintiff Gullett saw Defendant Bowen on August 7, 2005 for a urinary analysis and was prescribed medications. (*Id.* at 46-48.) Plaintiff Gullett saw Dr. Florence on August 9, 2005, and was taken to the hospital after passing out on August 10, 2005. (*Id.* at 48-51.)

## III. ANALYSIS

Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2000). "Section 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law." *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005).

To establish a claim pursuant to § 1983, a plaintiff must demonstrate two elements:

-12-

"(1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000). Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).

### A. Section 1983 Deliberate Indifference Claims Against All Individual Defendants

"A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *see also Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Thus, the § 1983 claim against Defendant Sheriff Graves in his official capacity is actually a claim against Coffee County and is redundant in light of identical claims brought against the County. Therefore, Plaintiff's § 1983 claims against Defendant Graves in his official capacity are **DISMISSED WITH PREJUDICE**.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Because the Eighth Amendment only applies to post-conviction detainees and two of the Plaintiffs were pre-trial detainees, those Plaintiffs must assert their claims pursuant to the Fourteenth Amendment. "While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment." *Gray v. City of Detroit*, 399

-13-

F.3d 612, 615-16 (6th Cir. 2005) (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001)).  To constitute an Eighth Amendment and, accordingly, a Fourteenth Amendment violation, prison officials must "'unnecessarily and wantonly inflict[] pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  A constitutional claim for denial of medical care under this standard has both objective and subjective components.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The objective component requires that the prisoner show he suffered from a sufficiently serious medical need.  *Id*.  The subjective component requires that the prisoner show that the prison official acted with a "sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).

## 1.    *Sufficiently Serious Medical Need*

To satisfy the objective prong, a prisoner must show that he suffered from a sufficiently serious medical need.  *Farmer*, 511 U.S. at 834.  A medical need is sufficiently serious when "it is one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Blackmore*, 390 F.3d at 897 (internal quotation omitted).  Defendants concede for the purposes of summary judgment only that Plaintiffs Brown, Swearington and Gullett can establish this objective prong because they all had medical conditions that required treatment.  Defendants specifically dispute that Plaintiff Brooks can satisfy this component.  Defendants do not address whether Plaintiff Bell can establish this prong;

-14-

therefore, the Court will address this component for both Plaintiff Brooks and Plaintiff Bell.

a.    Plaintiff Brooks

The facts establish that Plaintiff Brooks initially went to the hospital for elbow x-rays following a fall in the shower. (Brooks Dep. at 42-43.) Plaintiff Brooks contends that the emergency room doctor told him that he needed a CT scan of his elbow, but Dr. Florence and Defendant Bowen maintain that there was nothing wrong with Plaintiff Brooks' elbow, no CT scan was ever ordered by the emergency room doctor, and no CT scan was necessary for treatment. (Brooks Dep. at 43-44, 46, Florence Dep. at 73-74). Although Plaintiff Brooks repeatedly requested a CT scan, Defendant Bowen told him that she could not schedule a CT scan without a doctor's order, and Dr. Florence told Plaintiff Brooks that he would have to pay for the CT scan because it was not medically necessary. (Bowen Dep. at 32, Florence Dep. at 73-74.) Dr. Florence checked with the emergency room doctor and verified that no CT scan was necessary and the doctor did not suggest that one was necessary. (Florence Dep. at 73.) In fact, Dr. Florence testified during deposition that Plaintiff Brooks suffered from arthritis in his elbow and was prescribed medication for that condition. (*Id.* at 70-72.)

The Court finds that Plaintiff Brooks has failed to establish that he suffered from a sufficiently serious medical need. No physician diagnosed Plaintiff Brooks with any serious medical condition. Dr. Florence instead diagnosed Plaintiff Brooks with arthritis and treated that condition accordingly. Furthermore, Plaintiff Brooks has offered no evidence to establish that a lay person would have recognized that Plaintiff Brooks had an obviously serious medical condition. Because Plaintiff Brooks cannot satisfy this prong, his § 1983 claim must fail. Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff

-15-

Brooks' § 1983 claim is **GRANTED** and this claim is **DISMISSED WITH PREJUDICE**.

b. <u>Plaintiff Bell</u>

Plaintiff Bell asserted that he injured his finger when he hit his hand against the showerhead in the jail cell. (Bell Dep. at 27.) Although Plaintiff Bell did not initially think the cut was serious, the next day he requested medical attention and saw Defendant Yott. (*Id.* at 37-40.) Defendant Yott immediately sent Plaintiff Bell to the hospital. (*Id.* at 41-42, Yott Dep. at 55-56.) Defendant Yott sent Plaintiff Bell back to the hospital a few days later when the wound was getting worse. (Yott Dep. at 56.) Plaintiff Bell saw physicians who diagnosed an infected wound and prescribed antibiotics for treatment. (Florence Dep. at 59-61.) Furthermore, due to the way that Plaintiff Bell's finger looked, it was obvious to lay persons that Plaintiff Bell had a serious condition in need of treatment. (Freeman Dep. at 65, Bell Dep. at 48-49.) Therefore, Plaintiff Bell has established that he had a sufficiently serious medical need to satisfy the objective component.

2. *Deliberate Indifference*

The subjective component requires that Plaintiffs show that prison officials acted with deliberate indifference to their serious medical needs. "Deliberate indifference entails something more than mere negligence but can be satisfied by something less than acts or omissions for the very purpose of causing harm or without knowledge that harm will result." *Blackmore*, 390 F.3d at 895-96 (internal citations omitted). A prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Plaintiffs have alleged in the Complaint that Defendants "ignored the risk of substantial

-16-

harm to Plaintiffs" and acted with either malice or reckless disregard of Plaintiffs' constitutional rights. (Compl. ¶¶ 62-63.) Rather than discuss this prong in the context of each individual Defendant, for the sake of consistency, the Court will address each of the remaining Plaintiffs' claims separately under this standard.

a.    Plaintiff Debra Brown

Plaintiff Brown testified that she was injured on October 21, 2004 sometime between 4:00 a.m. and 5:00 a.m. (Brown Dep. at 90-91.) Plaintiff Brown further testified that her cell mates rattled the bars for approximately twenty to thirty minutes before Defendant Gentry came back to investigate. (*Id.* at 99-100.) Plaintiff Brown stated that she was on the floor and "screaming and crying" when Defendant Gentry saw her and, after bringing her Tylenol and a bag of ice, "[h]e left like nothing had happened." (*Id.* at 100-101.) Defendant Gentry testified that he received a call at 6:20 that morning and responded to Plaintiff Brown's cell, where she was laying on the bed. (Gentry Dep. at 17-18.) Plaintiff Brown told Defendant Gentry that she had slipped and fallen coming from the toilet, and Defendant Gentry testified that she did not seem to be in extreme pain. (*Id.* at 18-19.) Plaintiff Brown was moving her feet and stated that the pain was "bad, but not that bad." (*Id.* at 19.) Approximately fifteen minutes later, Defendant Gentry received a call that Plaintiff Brown was requesting to go to the hospital. (*Id.* at 20-21.) Defendant Gentry contacted Defendant Ferrell on the nursing staff and was told to give Plaintiff Brown Tylenol and an ice pack, and Defendant Yott would see her in the morning. (*Id.*) Defendant Gentry testified that it was not obvious that Plaintiff Brown needed to go to the hospital immediately because she did not appear to be in major pain. (*Id.* at 40.)

-17-

Defendant Gentry did not contact a nurse before Plaintiff Brown asked to go to the hospital because she did not initially make that request and it was not clearly necessary. (*Id.* at 41.)

Defendant Yott testified that he arrived at work around 8:00 or 8:15 that morning and went back to look at Plaintiff Brown. (Yott Dep. at 47-48.) After assessing the situation, Defendant Yott called 911 and Plaintiff Brown was admitted to the hospital at 9:05 that morning. (*Id.* at 48, Florence Dep. at 32.)

Plaintiff Brown has provided no evidence that would establish the subjective component of the *Estelle* test. Neither Defendant Gentry, Defendant Ferrell nor Defendant Yott acted in a manner that would demonstrate deliberate indifference to Plaintiff Brown's medical conditions. Defendant Gentry testified that Plaintiff Brown did not appear to be in obvious distress at the time and it was not apparent that she needed to be taken to the hospital immediately. Defendant Gentry further testified that he "may have reacted differently" if he had known that Plaintiff Brown was actually attacked by another inmate. (Gentry Dep. at 22.) Defendant Gentry had, on occasion, sent inmates to the hospital prior to consulting with the nurse. (*Id.* at 40-41.) In order to show that a prison official acted with deliberate indifference, the plaintiff must prove that he "was aware of facts from which he could and did draw an inference that his conduct posed a substantial risk of serious harm" to the inmate. *Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1995). Defendant Gentry's testimony does not support a finding that he was aware of a serious medical condition, and if he was not aware of such a condition, he could not have drawn the inference that his inaction could result in a substantial risk of serious harm to Plaintiff Brown.

Likewise, there is no evidence that Defendant Ferrell acted inappropriately. There was no way that Defendant Ferrell could have been fully aware of Plaintiff Brown's

-18-

condition solely on the basis of Defendant Gentry's phone call. Therefore, Defendant Ferrell could not have inferred, based on the limited facts provided to him, that his instructions to Defendant Gentry would result in a substantial risk of serious harm to Plaintiff Brown. Furthermore, there is no evidence that Defendant Yott had the required state of mind; soon after he arrived at work, he examined Plaintiff Brown and, immediately after the examination, he called 911 to have her taken to the hospital. Plaintiff Brown was admitted to the hospital approximately an hour after Defendant Yott began his shift. Plaintiff Brown has offered no evidence to establish that Defendants Gentry, Ferrell or Yott delayed her treatment in some malicious or reckless manner that would satisfy this prong.

Plaintiff Brown has failed to demonstrate that she can sustain a valid deliberate indifference claim against any Defendant regarding treatment for her injuries of October 21, 2004. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff Brown's claims is **GRANTED**.

b. <u>Plaintiff Jerome Bell</u>

Plaintiff Bell received a band-aid and antibiotic ointment for his injured finger approximately two hours after the injury occurred and shortly after he requested help. (Bell Dep. 33-34.) The following day, he filled out a medical request, saw Defendant Yott that morning, and was immediately sent to the hospital. (*Id.* at 37-41.) Plaintiff Bell testified that he cut his finger at 4:00 or 5:00 in the afternoon on October 1, 2004, and he was admitted to the hospital on October 2, 2004 at 10:34 a.m. (*Id.* at 35, 42-43.) Plaintiff Bell was prescribed strong antibiotics upon his release from the hospital. (*Id.* at 45-46.) On October 6, 2004, Plaintiff Bell was admitted to the hospital again. (*Id.* at 46-47.) Plaintiff

Bell characterized his second hospital admission as long awaited, stating that "I think that's when my mother come up and finally had something done because apparently I couldn't have nothing done, you know what I mean?" (*Id.* at 47.) Plaintiff Bell testified, however, that he did not fill out any medical requests between October 2 and October 6, and does not remember asking any of the jail staff for help. (*Id.* at 49, 51.) Dr. Florence testified that Plaintiff Bell initially refused to return to the hospital when his finger was getting worse. (Florence Dep. at 63.)

Plaintiff Bell has similarly failed to provide the Court with any evidence that would substantiate his § 1983 claim. Plaintiff Bell in fact received remarkably prompt treatment for his injured finger when he initially filled out a medical request form on October 2, 2004; he was in the hospital receiving aggressive treatment approximately 15 hours after the injury occurred and only a few hours after he made his request. Plaintiff Bell's failure to seek additional treatment between October 2 and October 6, when his finger was getting progressively worse, does not provide a basis upon which the Court may find that Defendants acted with a culpable state of mind as to his injuries. Plaintiff Bell knew the procedure for requesting medical treatment and could have filled out another form or made an informal request for treatment to one of the jail staff during this time. Plaintiff Bell's medical condition was urgent, but he apparently took no action on his own behalf, and may have even refused additional treatment.

"Deliberate indifference" can be demonstrated by circumstances such as "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There is no evidence that any Defendants intentionally delayed Plaintiff Bell's treatment. Plaintiff Bell

-20-

was treated promptly when he requested treatment, and any delay appears to be of his own making. Defendants cannot be faulted for Plaintiff Bell's inaction, and all of the Defendants involved with Plaintiff Bell's treatment–Defendants Yott, Freeman, and Graves–responded appropriately when made aware of the condition. There is no evidence before the Court to support the contention that any of the Defendants had the required state of mind to support a constitutional violation. Accordingly, the facts do not establish a valid deliberate indifference claim as to any Defendants based on Plaintiff Bell's injuries, and Defendants' Motion for Summary Judgment as to this claim is **GRANTED**.

### c.    Plaintiff Jason Swearington

Plaintiff Swearington sustained a cut on his left leg while on work detail. (Swearington Dep. at 21.) Plaintiff Swearington testified that work detail was voluntary, but he preferred it because he received two-for-one credit on his sentence. (*Id*. at 19-20.) When he sustained the injury, he reported it to someone supervising the inmates at work and was given a band-aid and antibiotic ointment, then returned to work. (*Id.* at 22-23.) When asked during deposition if Plaintiff Swearington told anyone that he needed to see a doctor, he replied that "[t]hey said I could see the nurse when I got in. As soon as I came in, I went in to see the nurse." (*Id.* at 24.) Plaintiff Swearington testified that the injury occurred at about 11:00 a.m. and that he returned to the jail at 2:30 p.m. (*Id.* at 22-25.) Upon his return, Plaintiff Swearington saw Defendant Yott and received gauze pads and more antibiotic ointment. (*Id.* at 25.) Plaintiff Swearington was already on antibiotic medication from a previously sustained spider bite. (*Id.* at 25-26.) Plaintiff Swearington testified that the leg was not getting better, so he saw Defendant Yott again in late

September and received ointment and sterile water to use to wash the wound. (*Id.* at 29.)
Defendant Yott told Plaintiff Swearington that his other symptoms at that time–fever, chills,
and vomiting–were from the flu. (*Id.* at 29-30.)

Plaintiff Swearington continued on work detail even as his symptoms worsened, and
thinks he may have asked to see the nurse once; however, Plaintiff Swearington did not
fill out a request for medical attention and instead just asked over the intercom if the nurse
was in. (*Id.* at 30-31.) Plaintiff Swearington acknowledged that he could have stayed back
from work detail to see the nurse at some point during the time that his injury progressed.
(*Id.* at 37-38.) Defendant Yott testified that work release inmates could always stay in if
they were sick. (Yott Dep. at 69.)

Plaintiff Swearington felt especially badly one day at work and was taken back to
the Jail, where an officer told him to lay down and said they would make an appointment
with Dr. Florence. (*Id.* at 32-34.) Plaintiff Swearington did not wait for his appointment, but
instead called his mother, who took him to the hospital. (*Id.* at 35-36.) After his first
hospital stay to treat his left leg, Plaintiff Swearington's right leg began to swell and turn
black. (*Id.* at 39-40.) Plaintiff Swearington told Defendant Hulan he needed to go back to
the hospital, Defendant Hulan apparently called his mother, and he was taken to the
hospital a few hours later. (*Id.* at 40-42.) Plaintiff Swearington's chief complaint is that he
should have received stitches to the initial wound. (*Id.* at 45-46.)

Plaintiff Swearington has failed to establish the subjective component of the
deliberate indifference test. There is no evidence before the Court that any of the
Defendants ignored Plaintiff Swearington's leg injury or acted maliciously or with reckless

-22-

disregard when he requested treatment. Plaintiff Swearington received prompt medical attention when it was requested, and although he believes that he needed stitches immediately, there is certainly no medical evidence to establish that Defendants deliberately or inadvertently failed to provide proper care, and there is no evidence to establish that Defendants acted negligently, other than Plaintiff Swearington's uncorroborated testimony that a doctor at the hospital told him he should have had stitches. (*Id*. at 46.) Regardless of whether this statement was true or untrue, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. The Court notes that, if made, the statement occurred over a month after the initial injury and after Plaintiff Swearington had seen Defendant Yott more than once for treatment. Defendant Yott never noted that stitches were necessary for Plaintiff Swearington's laceration, only that the redness around the cut could indicate there was an infection. (Yott Dep. at 70.) The cut was apparently not bad enough that Defendant Yott thought Plaintiff Swearington needed to go to the hospital but, again, a complaint of negligence does not rise to the required state of mind to establish a constitutional violation.

Therefore, the Court concludes that none of the Defendants involved with Plaintiff Swearington's wound exhibited any action or inaction that would lead a reasonable jury to conclude that they acted with deliberate indifference in treating his medical condition. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff Swearington's § 1983 claim is **GRANTED**.

        d.    <u>Plaintiff Nicole Gullett</u>

Plaintiff Gullett has many complaints regarding the dispensing of her medication and

the responsiveness of the nursing staff, but none of the evidence supports a finding that she has satisfied the subjective prong of this test and established that any Defendant ignored the risk of harm to her or acted maliciously or with reckless disregard as to her medical condition. Plaintiff Gullett testified as follows:

> Q: All right. Was Kay [Defendant Bowen] responsive to your requests?
>
> A. Sometimes. Not all the time.
>
> Q: When was she not?
>
> A. *Normally when she wasn't in.* Like I said, they would try to contact her by phone, but, you know, I don't see how the turnkeys were actually qualified to give out any medication. *So normally it would be when Kay came in the next day or the day after that I would get what I needed.*

(Gullett Dep. at 45.) (emphasis added). The letters that Plaintiff Gullett wrote to the nursing staff on the record indicate that some action was taken by nursing staff on each request. The nursing staff made notations on nearly every letter outlining the action taken–either that Plaintiff Gullett's medication had been delivered to the jail by her sister, or the nursing staff had evaluated her current symptoms, or the nursing staff discussed with Plaintiff Gullett the origin of various medical charges. (Court Doc. 29-11 pp. 10-12, 15-17, 26-31.) Naturally, Defendant Bowen and other nursing staff did not immediately respond to her requests when they were not on duty at the jail, but they did respond to her requests and letters promptly upon return. Plaintiff Gullett has failed to establish that any of the Defendants acted with deliberate indifference to her medical complaints or her requests for medication. In regards to receiving her medications, Plaintiff Gullett testified accordingly:

Q: Was there ever a time that you would sign to get the medication and then you weren't given the medication?

A: Yes. And I would tell the corrections officer that I didn't get that medication, and *they would tell me that they would make a note and that she'd let the nurse have it the next day and it should be taken care of.*

Q: Was there ever a time that you signed for the medication and the corrections officer then just said, "You can't have it?"

A. Not that I – not that I recall, but, I mean, there were several times that I wasn't given the Keflex, the Robaxin on scheduled time.

. . .

Q: My question is, was there ever a time on these days that you signed your name to these logs, that you signed the logs to receive your medication and the corrections officers willfully refused to give you your medications? Do you understand the distinction I'm making?

A: In a sense, yes, but, no, they would all – they weren't – to me, they weren't even qualified to dispense – to give the medication, first of all. Second of all, I'd sign for my medicine. I'd get my medicine. *If I noticed something wasn't there or if I noticed it wasn't the right medication, I would give it back and they were to make a note and talk to the nurse.*

Q: And I understand that. And my question to you – because you've alleged it in your Complaint – was there ever a time that any officer willfully refused to give you your medication after you signed for it?

A: If I noticed that my Keflex or my ibuprofen, anything – if I noticed after I signed and checked my medicine to take my medicine, *they would not go get my medicine, no.* Right. Yeah, yeah. They did deny me to go get my medication.

. . .

Q: Okay. But what I'm getting at, though, is there's never a time where a corrections officer says, "I've got your Keflex here and you can't have it." That never happened?

-25-

A: No.

(Gullett Dep. at 67-70.) (emphasis added). Plaintiff Gullett's testimony seems purposefully obtuse on this point, perhaps in an attempt to create an issue of deliberate indifference, but she eventually admitted that none of the Defendants ever willfully withheld necessary medication from her. When Plaintiff Gullett did not believe that she was receiving the correct medication, she informed the corrections officer and the officer would make a note to get in touch with the nurse. The fact that the dispensing corrections officer did not immediately find the nurse and retrieve Plaintiff Gullett's medication does not establish the subjective state of mind required for deliberate indifference. There is no evidence that the corrections officers intentionally denied Plaintiff Gullett her medication. There is certainly no evidence that any officer acted willfully such that he or she "was aware of facts from which he could and did draw an inference that his conduct posed a substantial risk of serious harm" to the inmate. *Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1995). Furthermore, there is no evidence that any of the corrections officers purposefully failed to convey her concerns to the nurse.

In addition, Plaintiff Gullett's allegations regarding improper treatment of her urinary tract infection are unfounded given the actual history of her treatment. Shortly after the onset of her symptoms, Defendant Bowen performed a urinary analysis and had Dr. Florence prescribe medication. (Gullett Dep. at 47-48.) Two days later, Plaintiff Gullett saw Dr. Florence, who performed another urinary analysis and prescribed additional medications. (*Id.* at 48-49.) The following day, Plaintiff Gullett was taken to the hospital after she passed out in her cell. (*Id.* at 50-51.) Plaintiff Gullett's treatment took place within a reasonable time frame, and this evidence does not support a finding that any

-26-

Defendant who participated in her treatment or the dispensing of her medications had the requisite subjective intent so as to satisfy this prong for deliberate indifference. Plaintiff Gullett has therefore failed to establish that any of the Defendants acted in a way that would satisfy the subjective component, and her § 1983 deliberate indifference claim must fail. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff Gullett's claim is **GRANTED**.

> **B.** **Section 1983 Supervisor and Municipal Liability Claims - Defendants Coffee County, Tennessee, Graves, and Freeman**

Plaintiffs assert a claim against Defendants Sheriff Steve Graves and Lieutenant Pamela Freeman in their supervisory capacities at the Coffee County Jail, and a claim against Coffee County, Tennessee under the theory of municipal liability. (Compl. ¶¶ 66-72.) Plaintiffs allege that all three Defendants maintained inadequate policies, practices or customs that established a deliberate indifference to Plaintiffs' medical conditions, namely by failing to have in place policies regarding medical treatment in emergency or other serious medical situations and failing to train corrections officers to respond appropriately to serious medical conditions. (*Id.*) Defendants submit that the supervisory claims against Defendants Graves and Freeman must fail because "[a] supervisory employee cannot be held liable under § 1983 for the constitutional torts of those he supervises unless it is shown 'that the supervisor encourages the specific incident of misconduct or in some other way directly participated in it.'" *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1998) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). Plaintiffs concede that this liability arises when a supervisor "encouraged, participated in, or authorized, approved, or knowingly acquiesced" in a constitutional

-27-

violation by a subordinate. (Court Doc. 32, Pl.'s Resp. at 6.)

The Court has assessed the various claims of all the Plaintiffs and found that none of the Plaintiffs can assert a valid claim under § 1983 for deliberate indifference to serious medical needs. Therefore, the Plaintiffs have failed to prove that any of the Defendants violated their constitutional rights. In the absence of a finding that there has been a constitutional violation, the Court cannot find that Defendants Graves or Freeman can be liable in a supervisory capacity for encouraging, participating in, approving of, or otherwise acquiescing to a constitutional violation that does not exist.

Plaintiffs assert a similar claim of municipal liability against Coffee County, Tennessee. Again, however, because none of the individual Defendants have violated any of Plaintiffs' constitutional rights, Defendant Coffee County cannot be liable. A Plaintiff must prove two elements for municipal liability: "(1) that a constitutional violation occurred; and (2) that the County 'is responsible for that violation.'" *Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004). *See also Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act."); *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). The Court found no underlying constitutional tort by any of the individual Defendants against any of the Plaintiffs. Therefore, Plaintiffs cannot establish the first necessary element for municipal liability. Accordingly, Defendants' Motion for Summary Judgment as to Plaintiffs'

-28-

supervisory and municipal liability claims against Defendants Coffee County, Tennessee, Sheriff Steve Graves, and Lieutenant Pamela Freeman is **GRANTED**.

### C.    Section 1983 Failure to Protect Claims

Plaintiff Debra Brown has conceded that summary judgment is appropriate as to her claim that Defendants failed to protect her from inmate Virginia Grimes. (Pl.'s Resp. at 7.) Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to these claims and they are **DISMISSED WITH PREJUDICE**.

## IV.    CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment [Court Doc. 27] is **GRANTED**. Accordingly, Defendants' Motion to Continue [Court Doc. 39], Motion for Leave to File Document Under Seal [Court Doc. 40], and Motion in Limine [Court Doc. 42] are **DENIED AS MOOT**.

**SO ORDERED** this 23rd day of December, 2009.

*s/ Harry S. Mattice, Jr.*
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE

-29-